**UNITED STATES v. HARRIS.**

**Civ. A. No. 2636.**

United States District Court
W. D. Louisiana, Monroe Division.

Oct. 5, 1951.

Arnold Teks, Chief Atlanta Trial Unit, OIIE, Atlanta, Ga., for plaintiff.

J. Norman Coon, Monroe, La., for defendant.

DAWKINS, Chief Judge.

This suit was filed by the Government on May 6, 1949, and demands judgment against defendant for three times the alleged overcharges on an apartment in a residence at 907 Natchitoches Street, West Monroe, Louisiana, for a period of one year preceding its filing. It alleges that the rental fixed by the Rent Control Agency was $17.50 a month, but defendant actually collected from the tenant, Mrs. Eula Mae O'Bannon, the sum of $25.00 per month from October 1, 1943, to June 1, 1948, and $30.00 from the latter date to May 5, 1949.

Plaintiff prays: "That in the event the Court grants restitution to the United States for and on behalf of persons entitled thereto, that portion of the overcharges ordered restored for violations occurring within the one year period immediately preceding the filing of this suit for which the Plaintiff prays treble damages is hereby waived, and may be deducted from the treble damages adjudged to the United States of America."

It also demands an injunction against the future collection of rentals in excess of the ceiling price of $17.50 per month.

Defendant admits that the rental was fixed at $17.50, but denies collecting anything in excess thereof.

## Opinion

■ This case presents clearly a "swearing contest" between the landlord and the tenant, in which the families on either side have joined. One or the other has committed perjury, and the Court is confronted with the duty of trying to ascertain where the truth lies, if possible, not beyond a reasonable doubt as would be necessary in a criminal charge, but by a fair preponderance of the evidence in this civil suit. Picoraro v. Insurance Co. of State of Pennsylvania, 175 La. 416, 143 So. 360, and cases cited therein.

The plaintiff's principal witness, of course, is the tenant, Mrs. Eula Mae O'Bannon. She swears that she was occupying the apartment when the building and lot were purchased by the defendant in this case in the latter part of September or early October, 1943, and for which she was paying the sum of $17.50 per month; that immediately beginning with the month of October, 1943, defendant demanded and collected of her $25.00 per month for the same accommodations to June 1, 1948; and thereafter, $30.00 per month until April 8, 1949, when the witness made a complaint to the Rent Control Board. She further testified that the defendant, when she asked for a receipt, said, "she didn't give no receipts," and none was ever given; that the rent was always paid in cash, except on two occasions, October 4, 1948, and March 1, 1949 (both after upping the rent to $30.00 per month) when she gave defendant, first, a check of one Sylvester Bruce Hale for $25.00, payable to cash, and $5.00 in currency; and the second time, a check of the same individual for $30.00. These two checks were produced and filed in evidence, and each bears the endorcement of the defendant. The witness swore they were handed to Mrs. Harris in the latter's bedroom. When asked if she knew she was "paying in excess of the maximum rent," she replied, "No, I didn't know I was paying illegal rent." Thereafter, "once in a while receipts was mentioned, but her statement had been that she didn't give no receipts, so the understanding was that I didn't receive any." The two checks were the only written evidence as to the amount of the rental.

On cross-examination, Mrs. O'Bannon said she usually paid the rent in full on the first of the month, but "once or twice, I paid her $15.00 on the first, and $15.00 on the 15th" of the month. No one else was in the room when she handed defendant either of the two checks. She did state, however, that "I think my sisters were present once or twice, and Mrs. Ellis, my daughter, and my son * * * paid my rent for me most of the time." She denied that members of the defendant's family had complained about a disturbance in the witness' apartment. She did not recall having a bank account and gave defendant no checks other than the two drawn by Hale. She had worked for Hale,

and these checks were in "payment for when I worked for him."

The daughter of Mrs. O'Bannon, Mrs. Richard Ellis, was then called and testified she lived in the apartment with her mother from the time it had been rented before Mrs. Harris purchased it until March, 1949; that "most of the time I had taken it (the rent money) to Mrs. Harris myself"; that for several years, just how long she did not know, it was $25.00 per month and was increased to $30.00, which was being paid when she married, the witness also making some of these payments. She never asked defendant for receipts.

On cross-examination she stated that the rent was paid on some occasions in the presence of Mrs. Butler and Mrs. Smith, daughters of the defendant. The witness knew nothing about the rent ceilings on the apartment, adding: "My mother and I have always rented, and if anybody we rented from told us what the rent was we paid that, and we thought they knew what they were doing. We didn't look into the law about it. We just felt that that was the rent that they collected for the place we were living in, and we had to pay it, and we paid it."

She further testified, "I paid it in full when I paid it." Later she added: "I never paid it in five and ten dollar bills. I mean I never paid five or ten dollars at one time, and then paid something else later. I either paid one-half of it on the 1st, and the other half on the 15th, or I paid the whole sum at one time."

She also stated that it was always paid in cash, when she paid it.

Mrs. Emma Lee Hall swore she was a sister of the tenant and, although she had never lived with her, that she saw the rent paid on one occasion in 1946 when it was $25.00 per months as follows:

"A. Well, I can't testify to the exact time, but I had been shopping one day, and I came into her place over there, and Mrs. Harris came in there, and my sister said, 'I will give you the rent while you are in here,' and I said, 'You should be like me—' I had been downtown shopping, and had two or three dresses that I had bought, and they were looking at them, and I said, 'You should be like me; we own our own home, and if you did you could be buying you some clothes and wouldn't have to be paying it all out in rent.'

"Q. How much did she pay the defendant? A. Twenty-five dollars.

"Q. What year was that? A. It was in 1946.

. * * * * * *

"Q. Who were present? A. Well, just me—I was visiting in my sister's home, and Mrs. Harris was there, and I had been shopping, and we were looking at the things that I had bought."

A second sister of the tenant, Mrs. Ola L. Simmons, testified as follows:

"A. Well, I was down there one day in 1948, and Mrs. Harris was out there in the back yard, so my sister told me, she said, 'I have got to pay Mrs. Harris the rent, and I don't have the correct change,' and asked me could I change a twenty dollar bill. I changed it for her, and she walked out and paid her thirty dollars. She had two twenty dollar bills, and I changed one, and I know she paid her thirty dollars. When I changed the twenty she walked out there, and I seen her pay her.

* * * * * *

"A. I never saw the rent paid but one time, and I just happened to be there that one time.

"Q. You just happened to be there one time? A. Yes, sir. Of course, I knew what she was paying, because she had told me about it, but that is all I do know."

On cross-examination, the witness said, after making the change of the $20.00, she stood in the kitchen and saw her sister go outside and hand the defendant the money. She was asked and answered questions as follows:

"Q. Did you actually see your sister hand her the money? A. Yes, sir, absolutely.

"Q. Did you see her hand her all of the thirty dollars? A. Yes, sir."

### Defendant's Evidence

The first witness called for the defense was Mrs. Margery Butler, daughter of the defendant, who was married in "1943, I think * * * just a few months after Mrs. O'Bannon started renting" from her mother, and except for six months continued to live there all her married life. She sometimes collected the rent herself, which was paid at times by both the defendant and her daughter, usually by the former; and the amount paid was never more than $17.50. The following is quoted from the witness' testimony:

"Q. In what manner did she make her payments? A. Some months she gave us maybe ten dollars one week, and then two weeks later she might give us five dollars, and then sometimes she would come back and borrow some of that money back from us. She would eventually get it paid sometime during the month.

"Q. Was Mrs. O'Bannon continuously during that period of time paying you and borrowing back from your mother, and then paying it back to her a second time? A. She didn't do it every month, but lots of months she did."

The witness further testified that during the period when Mrs. O'Bannon was renting the apartment the defendant and the witness were running a cafe in West Monroe and that she was present when the check for $30.00, dated March 1, 1949, was cashed. Her testimony is quoted in part as follows:

"Q. Now, were you present at the time either one of these checks were delivered to your mother? A. I was present when one of them was cashed.

"Q. Cashed? A. Yes, sir.

"Q. The twenty-five or the thirty dollar check? A. I believe it was the thirty dollar check.

"Q. It is dated March 1st, 1949? A. Yes, sir.

"Q. And marked 'P-3' for identification—I hand you this check and will ask you when and where that check was delivered? A. Mrs. May brought this check down to the cafe—

"Q. (interrupting) You are talking about Mrs. Eula May O'Bannon now? A. Yes, sir.

"Q. Proceed. A. Mrs. O'Bannon brought this check down there and wanted us to cash it for her, and my mother cashed it.

"Q. Then is it your testimony that this check was cashed at the cafe merely for the accommodation of Mrs. O'Bannon? A. That is absolutely correct. That is all there was to that transaction.

"Q. Did you cash it, or did your mother cash it? A. My mother cashed it, but I was there when she did it.

"Q. Let me ask you whether or not your mother handed her thirty dollars cash for the check? A. Yes, sir, that was cash. That twenty-five dollar check, I wasn't there when it was cashed.

"Q. Then you don't know about it. A. No, sir.

"Q. You don't know about it personally? A. No, sir, but I know it was not cashed at home because mother did not keep that much money there.

"Q. Were you ever asked for a receipt by her when the rent was paid? A. No, sir, I was not."

On cross-examination, the witness testified she was very close to and intimate with her mother, even after she married, and was able to state positively that Mrs. O'Bannon never paid more than $17.50 per month. Her testimony is further quoted:

"Q. Why didn't your mother give these tenants receipts? A. They didn't ask for them.

"Q. Didn't you or she know that the law required them? A. No, sir, I didn't know it required a receipt.

"Q. You didn't know that evidence of payment was very important in the eyes of the Rent Control people? A. No, sir.

"Q. That didn't occur to you at all, did it? A. No, sir, it did not.

*    *    *    *    *    *

"Q. Do you know what rent she paid to the previous owner? A. Seventeen dollars and fifty cents, I think.

"Q. How did you find that out? A. Well, I lived next door for quite a while, and I knew her very well when I lived next door.

"Q. And she paid the previous owner seventeen and a half? A. Yes, sir.

"Q. And continued to pay your mother seventeen and a half? A. Yes, sir."

The Court reminded the witness of the seriousness of her oath.

Counsel for complainant then took up the matter of how the two checks of October 4, and of March 1, had been handled. The witness testified that the cafe, where she claimed the checks were cashed, was known as the Manhattan, and its business transactions were handled in that name, but responded to further questions as follows:

"Q. But she endorsed this check "Mrs. Lucile Harris,' didn't she? A. Yes.

"Q. Ordinarily when she received and cashed checks in connection with her cafe business, she stamped 'Manhattan Cafe, By Mrs. Lucile Harris' on it, did she not? A. No, sir.

"Q. She maintained a bank account in the name of 'Manhattan Cafe,' did she not? A. No, sir.

"Q. How do you all pay bills, for instance, to buy groceries, or fish, or anything else you needed for the cafe? A. From the money that we kept in the cafe.

"Q. Didn't you pay by check? A. No, we didn't pay by check.

"Q. In other words, that cafe was not operated as a separate business from your rooming house, or apartments? A. It was operated, yes, separately.

"Q. It was a separate business? A. Yes.

"Q. And she operated the cafe under the name 'Manhattan Cafe'? A. Yes.

"Q. And she operated the apartment under the name 'Lucile Harris'? A. Yes.

"Q. The check was endorsed 'Lucile Harris'? A. Yes.

"Q. You have testified that after your marriage your relationship with your mother was very intimate and close, and you knew each and every transaction about that rent? A. I sure did. I was there most of the time when the rent was paid."

The Court again admonished the witness to tell the truth and asked many questions to determine the extent of her participation in and knowledge of what went on in the cafe, including one as to whether she and her mother kept any books for that purpose. The witness stated books had been kept, but these checks were not entered thereon.

The defendant was unable to attend the trial in person, and her testimony was taken at her home with both counsel present. She testified she bought the property in September, 1943, and moved in about two weeks later; that Mrs. O'Bannon was a tenant in the apartment at the time and remained there until shortly after the present suit was filed on May 6, 1949.

### Defendant's Testimony in her own behalf

Mrs. Harris stated she bought the property which included the apartment involved here in September, 1943, and that Mrs. O'Bannon occupied it at the time and did not move out when this suit was filed on May 6, 1949, until sometime in September, 1949; that the agreed rental was $17.50, and there was no increase at any time; that Mrs. O'Bannon always paid in cash, not by check; that she "paid them all," meaning the monthly rentals, but later stated the tenant's daughter "might have brought some in, but I don't remember it if she did. * * * Sometimes she didn't make them to me; sometimes she made them to my daughters, through the daughter who isn't here, and this one who is. I was working at that time; I wasn't here all the time." As to how the rent was paid: "Well, at different times—sometimes she came in and gave me ten dollars, and sometimes five, just whatever she had when she wasn't working. She just gave it to me when she had it." But all of it was paid before the tenant moved out. As to the giving of receipts, the following is quoted from defendant's testimony:

"Q. Now, was there anything said at the beginning of the rental by her or by

you about the subject of receipts for the rental? A. No, sir.

"Q. Did she ever ask you for a receipt? A. No, sir, she did not.

"Q. Then it is your testimony that nothing was said about receipts? A. No, sir, there was not.

"Q. Now, do you know what came up that caused Mrs. O'Bannon to file a charge against you with the Rent Control Board? A. No, sir. She got mad at my son-in-law, and got mad at me too, I guess, over a little racket that they had about she and a gentleman friend of hers making too much noise and keeping the baby awake, and he asked her to stop, and she got mad at him, and I guess she got mad at me too.

"Q. Do you have any personal knowledge about Mr. Butler and Mrs. O'Bannon having some words? A. Yes—well, I wasn't here, but when I came in they told me about it. I might have been here too, but that has been so long ago I don't know even when it happened.

"Q. But you don't recall being present or hearing anything that she said to him? A. No, sir.

"Q. Was it soon after that that investigation was made by the Rent Control? A. Yes. She knew that I wanted her to move, and that is why she got mad at me, after she caused all of that confusion."

As to the cafe, she testified, "Well, the first time I had it six months, and the last time six months." She was then asked and answered questions as follows:

"Q. You mean it was not a continuous operation for one year? A. No, sir.

"Q. What were the respective six months periods? A. It was during— really the first time I don't know just what date, but this last time—it has been about two years ago—yes, I know it was, because I know I haven't worked any in a year. I worked at the same place about ten years that I worked there during the time I wasn't running it. I just rented it from the owner.

"Q. Well, then, your work at the cafe was either as employee or owner of the place? A. Yes, sir, for ten years.

"Q. Beginning when, and ending when? A. Now, those dates I am not sure about. When did the war start?

"Q. Well, do you recall whether or not you were operating the cafe as owner, or just working there as an employee, from October 4th, 1948, through March 1st, 1949? A. I was operating it during that period, I am sure. That has been two years—

"Mr. Miller: (Interrupting) Two years from the period he specified?

"The Witness: Yes, sir. I don't remember the date."

By Mr. Coon: "Q. Now, Mrs. Harris, there has been offered in evidence two checks, one for twenty-five dollars, dated October 4th, 1948, the other for thirty dollars, dated March 1st, 1949, both of which were signed by Mr. Sylvester Bruce Hale, and made payable to the order of cash. I believe they were both drawn on the Central Savings Bank & Trust Company, and each of them were endorsed 'Mrs. Lucile Harris', and cashed and paid by the bank. I will ask you under what circumstances, and for whom you cashed these checks, and under what circumstances, and at what place, and for what purpose? A. I cashed them for her down at the Manhattan Cafe, and gave her the money.

"Q. Then do I understand it to be your testimony that you merely cashed these two checks for her as an accommodation? A. Yes, sir.

"Q. Did either one of them have anything to do with the payment of rent? A. No, sir.

"Q. Were these the only two checks you ever cashed for her? A. Yes, as well as I can remember. I might have cashed more, but I don't remember."

She further stated that her daughter, Mrs. Butler, had lived with her during the entire period from the time the property had been purchased to the date Mrs. O'Bannon moved out, with the exception of two weeks, helping with the cafe when defendant was owner and "sometimes" when it was being run for Mrs. Patton; that another daughter, Mrs. Smith, was "with me

all the time only for about two years," while her husband was in the armed forces, "* * * I think it was 1948 and 1949"; and that this daughter received payments of the rent from Mrs. O'Bannon for the witness. Both daughters were familiar with defendant's business and helped, including collecting the rentals paid on the apartment by Mrs. O'Bannon.

The witness further stated that she knew Mrs. Ellis, the tenant's daughter, and her sisters, Mrs. Hall and Mrs. Simmons, and that neither sister had ever paid her any rent for Mrs. O'Bannon. She denied the incident of the payment of the rent in the backyard, and the changing of the bills, as testified to by one of the sisters, and added as to Mrs. Simmons, "She was just the kind of woman you didn't want to have anything to do with * * * she didn't have anything to do with Mrs. O'Bannon." The witness did not see Mrs. Simmons in that side of the house, "I would say, six times * * * she has been there a very few times." As to Mrs. Hall, she "would just run in there and run right out * * * she never stayed thirty minutes at any time that I ever heard or knew of. * * * I hardly knew her." No payments of rent were ever made to her in the presence of any of Mrs. O'Bannon's relatives.

On cross-examination, defendant admitted she had bought the house in September, 1943, when "Mrs. O'Bannon was already a tenant in this apartment next door." The following questions and answers then took place:

"Q. Did you see this registration that they filed showing that they were charging her seventeen dollars and fifty cents per month rent at the time? A. Yes.

"Q. You knew that when you bought the property, did you not? A. Yes, sir.

"Q. They discussed that with you, and disclosed it to you, when you were negotiating with them? A. Yes, sir.

"Q. So that you knew the property was renting at that time for seventeen dollars and fifty cents? A. Yes."

The defendant was separated from her husband about four years before the testimony was given, and prior to that time,

Mrs. O'Bannon had paid the rent to him, but he was dead when this suit was tried.

Mrs. O'Bannon was either called to or voluntarily went to the Rent Control Office to complain about the alleged overcharge in April, 1949, but continued in the apartment until "about the last of September" of that year, and during this time paid the rent at $17.50 by Post Office Money Orders registered to the defendant.

As to what she knew about the requirement of giving a receipt to the tenant, the defendant was asked and answered questions as follows:

"Q. When you were advised by the People's Homestead and Savings Association that they had registered this property at $17.50, which was the maximum rent, didn't you also find out that the rent regulations required you to give receipts? A. No, sir.

"Q. When did you first find that out? A. I didn't find it out.

"Q. You never have found it out yet? A. No, sir.

"Q. It is a fact, however, that you did not give receipts? A. No, sir.

"Q. When you were called into the Area Rent Office for a conference about this alleged over-charge, do you remember to whom you talked? A. Mr. Graham.

"Q. That was in April of 1949, right after he had talked to Mrs. O'Bannon? A. Yes, sir."

She further testified that she informed Graham, the Agent of the Rent Control Office, she had never charged or collected more than $17.50. The house when bought was first put in the name of Cary Lee Raines, because "my husband was of the draft age at that time, and * * * put it in his name." Later, Raines transferred it to the witness' husband, and after that "he put it in my name afer we got our divorce," about 1947. She denied in toto the testimony of Mrs. Richard Ellis, daughter of Mrs. O'Bannon, about the rent being paid in her presence, as well as remarks of Mrs. Hall, the tenant's sister, that if Mrs. O'Bannon owned a home, she would not have to pay rent and could buy clothes like she was doing. Defendant denied that Mrs. Ellis ever brought the rent to her.

"She might have brought it to my children, but not me." She further testified: "Q. Didn't she (Mrs. Ellis) ever hand it to you? A. If she did, I don't remember it." Her daughter, Mrs. Butler, lived with her most of the time, and a part of that period, the husband stayed there also. She had another daughter, Mrs. Smith, who likewise stayed with her most of that time, as did the latter's husband when not in an army camp. Mrs. Smith was married in 1942, before the house was acquired, but had been away for about two years while with her husband in Italy. She was asked about the cafe and answered questions as follows:

"Q. In whose name was the license for the Manhattan Cafe issued for 1948? A. The first six months it was in my name.

"Q. The first six months of 1948? A. The first seven months.

"Q. Of 1948? A. Yes, sir.

"Q. In whose name was it issued last year? A. Mrs. I. A. Patton.

"Q. In October, 1948, the license was issued in Mrs. Patton's name? A. Yes, sir.

"Q. In October, 1948, when you stated you cashed this check for $25.00 at the cafe for Mrs. O'Bannon, you were just an employee there, is that correct? A. That is correct.

"Q. What did you do with it? Did you handle it as a cash item, and put it in Mrs. Patton's cash register? A. Yes, when I cashed the check I put it in the register to go to the bank and get it cashed.

"Q. Did Mrs. Patton keep a bank account? A. Yes, she did.

"Q. Why didn't you have the check to go to her bank account, and why wasn't it endorsed 'Manhattan Cafe'? A. I went to the bank and cashed it myself after I cashed it for her and put it in the register. I had the cafe by myself when I was working for her about the same as when I owned it.

"Q. But you took the cash money out of the register and gave it to Mrs. O'Bannon? A. Yes, sir, and then later walked down the street and cashed it and put the money back into the register.

"Q. Where was the bank? A. Right up on the corner.

"Q. Why was it Mrs. O'Bannon couldn't walk to the bank as good as you could? A. I don't know. She simply brought it in there and asked me to cash it.

"Q. Now, in 1949, in whose name was the license to the Manhattan Cafe? A. The first seven months it was in mine.

"Q. In other words, the first of 1948 and the first of 1949? A. No, sir, I had it during the war the first time.

* * * * * *

"Q. Let me put it this way: During the last period when you owned the cafe Manhattan approximately six months, was that all within one calendar year? A. Yes, sir, the first part of the year when I had it seven months.

"Q. Then there was no time in which both March and October came in the same year that you owned it? A. No, sir.

"Q. So, if you cashed one check for thirty dollars in March and one for twenty-five dollars in October, you couldn't have been the owner of the cafe both times? A. No, sir.

"Q. Now, on that thirty dollar check in March of 1949, did you also take the cash out of the register and cash it and then go down to the bank and cash the check? A. No, sir, I didn't have enough money in the register to cash checks unless I went down and cashed them myself right away.

"Q. It was just as close to the bank for Mrs. O'Bannon as it was for you, was it not? A. Yes, sir.

"Q. One or the other of you had to go to the bank and get the money eventually, isn't that correct? A. Yes."

It thus appears that the two periods of approximately six months each that defendant operated the cafe in her own name were, first, during the war, and the second time, the first half of 1948, so that both on October 4, 1948, and March 1, 1949, when these checks for $25.00 and $30.00 were cashed, it was the business of Mrs. Patton.

The witness was next asked if she knew that a Mrs. Add Bryant had made a statement supporting Mrs. O'Bannon's complaint and replied that she did not.

Under further cross-examination, she denied the overcharges, and counsel for complainant indicated that the suit was not filed until Mrs. Bryant's statement supporting the tenant had been obtained. However, the latter's statement was never produced, and she was never called as a witness, nor was any reason given for the failure to do so. Defendant admitted the tenant, after making the complaint, paid her the rent with Post Office Money Orders, and when asked if she left voluntarily "or did you take steps to make her leave," replied, "She sold her furniture and left * * *."

The note of evidence indicated, from the questions asked, that before the testimony of defendant was closed, the book or books of the cafe had been found and appeared to be written up in the handwriting of both the defendant and her daughter; but there was no entry of either of the two checks therein. Defendant categorically denied that they were given in payment of the rent.

The testimony of Mrs. Mary Smith, one of defendant's daughters, was taken by commission in Augusta, Georgia, being absent with her husband who was in the military service. She testified that she had lived in this same house with her mother from 1943 "and I left there in July of 1947"; that the rent paid by Mrs. O'Bannon was $17.50 per month, which the witness received for her mother on many occasions; that it was usually paid on the first of the month in cash, and only in the home, and that sometime only a part would be paid at a time. She never gave the tenant any receipts.

On cross-examination, she knew Mrs. O'Bannon was paying the people from whom she was renting when the house was purchased $17.50 per month, and this was continued to her mother. As to the two checks, the witness was not there when they were handled—"however, I do know that mother frequently cashed checks for Mrs. O'Bannon, but these checks were not given for rent." She was unable to throw any light on the checks but stated, "My mother rented the cafe in 1948, but we did not run the cafe the whole of 1949." The witness further stated that she did not know whether her mother kept a bank account for the cafe, but "I do know she had one for herself. I don't know why she didn't pass them (these two checks) through her own bank account."

The testimony as thus quoted and summarized on either side rather forcefully illustrates the difficulty with which this Court is confronted in trying to arrive at the truth. Quite often, when witnesses testify in flat contradiction of each other, situations or circumstances develop from which an experienced trier of facts, in applying the rule of reason or common sense, in the light of its knowledge of human nature, is able to put its finger on some outstanding circumstance which is controlling. In another similar case, tried a short time ago (U. S. v. Mrs. Eula T. Street—Civil action No. 2711), it was the highly improbable contention of the landlord that she had permitted the tenant to continue for two years to occupy a two-bedroom apartment at $17.50 per month, one-half of the rental for which she had previously rented the same space as two units, or $35.00 per month. The landlord there could have received, by the simple means of applying to the Rent Control Office, to re-establish the two units, the former rental of $35.00, instead of the $17.50 she claimed she collected. Her excuse was that she was not in good health and did not like to go to the trouble of making the application, all in the face of her admitted dissatisfaction with the rent which had been fixed for the space as a single unit. (The tenant had testified that she had to pay $35.00, instead of the $17.50 which the landlord claimed to have collected.) We all know that self-interest usually has a great influence upon our conduct in the circumstances of that case.

In the present case, there are circumstances of a similar nature, not on one, but on both sides, which will be reviewed briefly, taking up the tenant's contentions first. It must be conceded, I think, that if Mrs. O'Bannon's story is to be believed

as to what she paid, there were substantial reasons for her not submitting to the two large increases in rent which she claims were made. Both she and the defendant agreed that she was paying only $17.50 per month for the apartment at the time the latter purchased it. Notwithstanding this, the tenant says it was immediately increased to $25.00, a little more than 42%, which she continued to pay without protest to June 1, 1948, about four and two-thirds years; and on the latter date, it was further increased to $30.00, or approximately 71% over what it admittedly should have been. She and her witnesses say that from the beginning Mrs. Harris refused to give receipts and thereafter they were not requested. The tenant and her family also say, in effect, notwithstanding the Second World War was at its height when defendant purchased the property and with one or more male relatives participating therein, they did not know about Rent Control or that the landlord could be required to give receipts. In some unexplained way, however, in April, 1949, after what defendant described as the disturbance and verbal conflict of the tenant with some of defendant's family, Mrs. O'Bannon promptly found her way to the Rent Control Office and entered a complaint. The Agent in Charge summoned the defendant, who denied the charge, and it was only after the tenant produced a witness who made a supporting affidavit that this suit was entered. Unfortunately, as stated this witness was not called, nor was his absence accounted for. Thus, for four and two-thirds years, September 1, 1943, to June 1, 1948, the tenant paid at the rate of $90.00 annually above the ceiling, or a total of approximately $420.00, all but a small portion of which, from May 6, 1948, to June 1 of that year, some twenty-five days, had prescribed and could not be included in this suit; and in addition, paid a further over-all increase amounting to $150.00 a year from June 1, 1948, to April 8, 1949, or about $128.00, thus making a grand total of almost $550.00 above the ceiling.

Mrs. O'Bannon, of course, was supported by her daughter, who says she paid the rent a good part of the time, and by two sisters who testified each to a single incident, as above set forth, of seeing or knowing the amount of rent which was being charged. The circumstance of relationship of these supporting witnesses must also be considered in weighing their testimony.

Then there were two checks payable to cash, as above mentioned, drawn by one Hale, the first endorsed by the tenant, not in her full name of Eula May O'Bannon, but simply "Eula May," with a pen, and below the defendant's name appears written in pencil. There was no explanation of these circumstances, that is, whether Mrs. O'Bannon forgot to add her full name or why, being made payable to cash, either she or the defendant thought it was necessary to endorse the check at all. The identical same circumstances are true with respect to the check dated March 1, 1949. Nor does Mrs. O'Bannon, whose testimony apparently was intended to convey the idea that these checks were given by Hale for work she had done or was doing for him, explain why her employer saw fit to make them payable to cash, rather than to herself to serve as his own receipt for her pay. Does this tend to support her statement that the check was delivered in the defendant's bedroom, and, who, because of the insufficient endorsement of the tenant's name, was required to endorse them herself at the bank? Or does it indicate that for different reasons, they were given to her by Mrs. O'Bannon and cashed at the cafe, each time forgetting to add her surname, thus requiring defendant to endorse them when taken to the bank? If at the home, Mrs. O'Bannon was just across the hall, but if at the cafe, she could have been elsewhere when the defendant went to the bank. Yet, there is little in all of this to support either witness, except that Mrs. O'Bannon says no one else was present when she handed defendant the checks of $25.00 and $30.00 other than defendant and herself; whereas, Mrs. Harris and her daughter say both were present on each occasion when the checks were cashed and the proceeds paid to Mrs. O'Bannon at the cafe.

### The Defendant's Side

Mrs. Harris, the landlord, whom the Court did not see, just as strongly denied ever collecting more than $17.50, the amount Mrs. O'Bannon was paying when the property was purchased. She is supported in this by her own daughters, whose testimony, of course, is affected by the same condition of relationship as the supporting witness of the tenant. However, as will appear above, according to one of these daughters, the defendant did have a bank account which might have thrown some light on the matter, as could her income tax return, neither of which was produced or called for by either side.

In describing the manner of handling the two checks, the defendant swore that when the first one was presented at the cafe, she took currency from the cash register and cashed it immediately, later taking it to the bank on which it was drawn, about a block away from the cafe, where it was paid and the proceeds brought back and put in the register. The cafe business at that time, October, 1948, was undoubtedly being run in the name of Mrs. Patton, who most likely had a bank account. As to the second check for $30.00, Mrs. Harris said she did not have sufficient money in the register to cover it and instead of so informing Mrs. O'Bannon and letting the latter go to the bank, she, the defendant, immediately took the check to the bank, cashed it, brought the money back and gave it to Mrs. O'Bannon—a most improbable story! In any event, neither check appears entered on the records of the cafe. The defendant admitted she never gave any receipts, but gave as a reason they were never requested, which is also improbable.

▉▉ It is thus seen that the evidence, on both sides, is filled with contradictions, improbable statements, self-interest and motives which pretty well balance one against the other. We are confronted with the principle of law that plaintiff carries the burden of proving its case by a fair preponderance of the evidence. As stated earlier, the Court did not see all of the witnesses, but let it be known emphatically that some of those who appeared com-

mitted perjury. Taken all in all, it cannot be said that there is a fair preponderance of the evidence one way or the other, from which it must follow that the Government has not proven its case as required by law.